## Case No. 12,954.

### SLOCUM v. SWIFT et al.

[2 Lowell, 212.] [1]

District Court, D. Massachusetts. March, 1873.

EVIDENCE — PAROL — WRITTEN CONTRACT — SHIPPING — WHALING VOYAGE — DURATION — PASSAGE MONEY — FREIGHT — COMMISSIONS.

1. In the absence of fraud, a contract between the master and owners of a whaling-ship cannot be varied by parol evidence.
[Cited in The Elvine, 19 Fed. 528.]

2. A contract between owners and master for a whaling voyage not exceeding five years' duration does not mean several voyages extending through five years, but ends when the object of the voyage is fulfilled; that is, when a full cargo is obtained.

3. When the voyage was to end at New Bedford, and the parties afterward agreed to end it at San Francisco, the master was allowed the expenses of his passage to New Bedford.

4. The owners were allowed freight on oil from San Francisco to New Bedford.

5. A master was allowed a commission for selling oil after the voyage was ended; but was not allowed extra pay as cooper for eighteen days, when the cooper was ill.

6. Commissions charged for sales by the owners were disallowed.

The libellant [G. W. Slocum] was master of the bark Louisa, which, by the articles, was "bound from the port of New Bedford, on a voyage not exceeding five years in duration." By the first article it was agreed "that the term of service of any of the undersigned shall not end, nor shall any one be entitled to a discharge, until the expiration of said term, unless said ship shall sooner return to said port of New Bedford, and the voyage be terminated." The libel propounded that the voyage was begun May 4, 1869, and was prosecuted in the Atlantic and South Pacific Oceans until March, 1872, when the libellant received orders to take the ship to San Francisco and fit her for a cruise in the Arctic Ocean; that the libellant was not bound to serve in the Arctic, but he took the vessel to San Francisco and delivered her to the owner's agent, and spent eighteen days in fitting out the ship for the new service. It was admitted that the libellant's pay, if due, was nearly $6,000, and a considerable part of this was paid him before the hearing. The respondents [Jireh Swift and others] denied that the libellant had any right to refuse to go to the Arctic, or any strict title to be paid before the return of the ship to New Bedford. Several items of charge on the one side and the other were disputed, as is sufficiently explained in the opinion of the court.

T. M. Stetson, for libellant.

G. Marston, for respondents.

LOWELL, District Judge. In the absence of fraud, the contract of the master of a whaling-ship with his owners cannot be varied by parol evidence. The only authority cited for the libellant is The Cypress [Case No. 3,530], in which Judge Betts says, that seamen have, in numerous cases, been permitted to prove that the articles did not set forth correctly the agreement entered into by them, and that, even without evidence, the court will set aside agreements injurious to the seamen. The cases which the learned judge gives in this connection are all in support of the latter clause of his proposition, or rather of his second proposition, that the admiralty court will set aside unreasonable clauses. Mr. Justice Curtis examines the question with great ability, and cites many cases against the admission of the evidence, though he differs from them, and admits the parol proof, on the ground that the statutes of 1790 [1 Stat. 131], and 1840 [5 Stat. 394], and especially the tenth clause of the latter, make void a contract with seamen, if it does not state the voyage truly; and he holds that parol evidence may always be

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

given to show illegality as well as fraud in a contract. Page v. Sheffield [Case No. 10,-667]. That case settled the law for this circuit, upon an intelligible, if debatable, ground; but it has no application to the libellant's contract, because a whaling voyage is not within those statutes, and because the master is not a seaman by those laws. They require the master to make a written contract with the men, but leave the owners to make their own arrangements with their agent, the master; and if these parties make a written contract, it must be construed and acted on like all other written contracts made between parties of equal standing. All the cases, therefore, which Mr. Justice Curtis distinguished from the case before him, become valuable in deciding this controversy.

The learned judge who decided the case of The Cypress, above cited, reconsidered the point twenty years afterwards, and in a careful opinion laid down the doctrine that seamen bound themselves conclusively by the articles in the absence of fraud or deception. The Atlantic [Case No. 620]. One of the head-notes to Willard v. Dorr [Id. 17.680], is, that the shipping articles are evidence of the terms of hire, even of the master or his apprentice, but are not conclusive. On turning to the judgment, we find that the objection was taken by the owners that the master usually made the contract himself behind the backs of the owners, and therefore it could not be used as evidence in his own favor in a suit against them. Story, J., decided that the articles were, prima facie, presumed to import verity, and to be as well known to the owners as to the master, and that if the owners intend to contest them they should give evidence of fraud, mistake, or interpolation. His course of reasoning clearly goes to hold the master himself bound, unless he, on his side, can show like grounds for setting aside the written contract.

Leaving out of view the parol evidence, what is the meaning and effect of this contract? The libellant contends that the description, "a whaling voyage not exceeding five years in duration," means that he is bound to serve until he obtains a full cargo of oil, but in no event more than five years. The owners read it that he is to serve for five years, if they choose to order him to remain abroad so long, no matter what may have been his success, and that they can order him to pursue the business of whaling in any seas to which they may choose to order him. Although, as I have said, the master is supposed to be sui juris, and not to be under the care of the court to the same extent as the seamen, yet, as we know that the articles in a whaling voyage are always, in fact, drawn up by the owners, or by their order and direction, they ought to be taken most strongly against the owners. If they intend a series of voyages to any and all parts of the world, they ought to be careful to express

this clearly in the contract. The words, "a voyage," seem rather to imply that when the object of the voyage has once been accomplished the ship is to return home. Such is the opinion of Judge Ware in Gifford v. Kollock [Case No. 5,409]. Whether the articles in that case contained the provisions, which are found in these, for the master to ship oil home or elsewhere, "during the voyage," I do not know. This is the only part of the contract that seems much to favor the respondent's construction. This clause was introduced into the form of articles used in New Bedford; and I have upheld the stipulations of the crew to allow the charge and freight on oil so shipped, upon evidence that it was beneficial to both parties, and necessary to the successful prosecution of the business as now conducted, especially if ports on this coast would compete with others nearer the whaling-grounds.

But I have never before been called upon to say whether that permission modified the contract by implication in respect to the voyage itself. I do not think it ought to have that effect. It would undoubtedly aid in construing an ambiguous agreement, and the effect of taking advantage of it may sometimes be that the ship will, on the whole, send and bring home more than a full cargo; but its primary purpose in such a contract as this, which is for one voyage, must be held to be of a secondary character, intended to relieve the ship of the trouble and risk of carrying her oil about wherever there may be occasion to cruise before the voyage is completed.

It is very difficult to reach any satisfactory conclusion from the letters between the parties, whether they understood the articles in the one way or the other. There are expressions both of the master and of the owners, which tell against the construction they now set up respectively. But I think it results from the whole correspondence, that whatever may have been thought to be the strict rights of either in the matter, which were in no sort made a question at that time, the contract was so far modified by consent of both, that a return to New Bedford was abandoned, and the voyage was ended at San Francisco. This being so, I think the libellant is fairly entitled to have his passage home paid by the owners; because this is the general rule, and ought to be implied, where nothing is agreed to the contrary. He had offered to pay his passage home from New Zealand, but under different circumstances, and that offer was never acted on.

It does not follow that the defendants were bound to transport the oil to New Bedford at their own expense. Oil has no domicile; although the contract undoubtedly is, that the crew are to make the oil, and the owners are to transport it, yet, so far as these parties are concerned, the question of freight depends upon the contract as modified by common consent. When they had agreed upon

San Francisco as the terminus, the owners might have sold the oil there, if that course would have been for the best interests of the parties; or they might have shipped it to New Bedford "or elsewhere," in the language of the shipping articles, provided no delay of settlement was caused thereby, and a higher price was obtained, after deducting freight and other necessary charges. They were bound to exercise their best skill and judgment in disposing of the oil and bone at the best accessible market. I understand that the course they took proved to be the best.

For the oil that was sold at San Francisco for the convenience of the defendants, to enable them to refit the ship without sending out funds for the purpose, the master should be allowed the same price as was obtained for that which was sent home, less the proportionate freight. If the libellant performed services at the port of discharge beyond what were in the line of his duty, such as selling oil for the prosecution of the new enterprise, he ought to be paid for them. His lay covers every thing he would have been bound to do, or might choose to do, in relation to the voyage itself, and no more. The owners have charged him a commission on the sales which he effected; this charge must be rejected, and the same or some equivalent charge be transferred to the other side of the account.

The commissions at the home port were never allowed by Judge Sprague. He thought the custom to charge them was not reasonable, because it appeared to be a charge by the owners for performing their part of the contract. I see no reason to depart from this course of decision. Indeed, I believe I have followed it before. The owners in many cases do not sell the oil, if they prefer rather to pay the cash market price and take the chance of a rise. I do not say that the master might not compel a sale of so much as would establish the market price, but I have never known this to be insisted on; and the commission, so far as it is charged for selling the oil, is not only for work which the owners do as part of their contract, but which they in fact, in the majority of cases, do not do till after the settlements are made. So far as the commission is intended as compensation for the services of agents, the case must stand precisely as if there were but one owner. If the sole owner sold the oil and made up the accounts, then, according to the decisions, he is merely doing what is necessary to ascertain the lays, and should not charge for it; and it is no concern of the master and men whether the owner finds it convenient to employ an agent or not.

In asking pay for doing the cooper's work for eighteen days, the libellant appears to be standing on what he considers his strict legal rights. One who ships in any capacity takes the chance of extra labor, care, and responsibility which may devolve on him by any accident of the voyage. If the mate had fallen ill for a short time, the master could not, I think, have claimed mate's pay in addition to his own for an increase of work; nor could the mate, if the master had been ill for a short time. On the other hand, it has often been decided that a man or a mate, who is promoted de facto or de jure during a voyage, is afterwards to have the wages of the higher station. There are many cases of meritorious conduct and arduous service, in which no legal title to extra pay can be recognized, but reliance must be placed on the liberality of owners or underwriters. It is not easy, perhaps, to lay down the precise limits of the strict right. Each case must be decided on its own facts. Here I decide that there was no such service performed as requires the owners of this ship to pay the master any wages as cooper, though it may be he would have had a legal claim on the cooper.

This opinion will enable the parties to settle the account, I suppose, without reference to an assessor.

Interlocutory decree for the libellant.